REVISED MARCH 17, 2003
**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 02-40208

United States of America,

Plaintiff/Appellee,

VERSUS

Fredi Neptal Ramirez-Velasquez; David Villarreal-Lara,

Defendants/Appellants.

Appeal from the United States District Court
For the Southern District of Texas

February 21, 2003

Before JOLLY, DUHÉ, and WIENER, Circuit Judges.

DUHÉ, Circuit Judge:

Following a jury trial, Fredi Neptal Ramirez-Velasquez and David Villarreal-Lara were convicted of possession with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and Villarreal-Lara was convicted of conspiracy in violation of 21 U.S.C. § 846. Both defendants appeal. We affirm.

**I. FACTUAL AND PROCEDURAL HISTORY**

Fredi Neptal Ramirez-Velasquez ("Ramirez") worked as a driver for Kaizen Auto Transport, a company that receives Chrysler

vehicles manufactured in Mexico, then distributes them to U.S. dealers by truck. The Kaizen facility consists of two lots, side by side, surrounded by security fencing. On one lot is a parking lot, on which the vehicles to be delivered are stored, and the Kaizen office building, which contains offices and a room used by the Kaizen drivers. The second lot is demarcated by a line of trees and was used primarily to store auto transport vehicles. The gated entrance to the facility is situated near the office building, and security guards are posted near the office building at night and on weekends.

Vehicles arriving from the factory are inspected for damage and then catalogued onto dispatch sheets; each dispatch sheet lists the vehicles to be delivered and their destination. Kaizen drivers select delivery destinations on a first-come, first-served basis. When a driver selects a dispatch sheet, the security guards record the vehicle identification numbers of the assigned vehicles, and the driver must inspect the vehicles for damage or shortages. The driver then loads the vehicles on an auto transport vehicle ("transport") and delivers them to the dealer.

Transports are tractor-trailers on which six or seven vehicles can be loaded. The method used to load a transport is to load the top tier of the transport, then raise it with hydraulic lifts and load the bottom tier. The structure of the transport is such that one wishing to access a vehicle on the top tier after it has been raised must climb up and hold on—there is very little room to

2

stand.

One Sunday, Ramirez arrived to work at 8 a.m. Armando Velasquez and Hector Soto ("Soto"), Kaizen security guards, were the only other people at the facility. Ramirez obtained his dispatch sheet and then made a call from a phone in the drivers' room. Soto overheard Ramirez state that he needed "liquid." Phone records indicate that the call from the drivers' room was placed at 8:07 a.m. to a cellular phone owned by David Villarreal-Lara("Villarreal"), a mechanic for Kaizen.

Villarreal was on call seven days a week, twenty-four hours a day. That notwithstanding, he rarely worked weekends; in the two years that Soto had been a weekend security guard for Kaizen, he had seen Villarreal only four times. John Bannerman ("Bannerman"), a Kaizen safety supervisor, served as the backup on-call mechanic, and often worked weekend service calls in Villarreal's place. This day, however, Villarreal did report to the Kaizen facility in response to Ramirez's call.

Ramirez's habit in loading his auto transport was to pull the transport into the loading area situated near the Kaizen office building and the security guards' post. Once in the loading area, Ramirez would retrieve and inspect one vehicle, load it onto the transport, and then retrieve and load another. On this day however, Ramirez did not pull his transport to the loading area; instead he drove it to the second lot and parked it behind the trees, which obscured the security guards' view of the transport.

3

After completing his phone call, Ramirez went to his transport and began loading. Shortly thereafter, Soto saw a large van arrive and proceed to the area where Ramirez had parked his transport. Between five and ten minutes after the van arrived, Villarreal approached the Kaizen office building and greeted Soto and Velasquez. He then retrieved the service truck, which housed tools used for maintenance of transports, and returned to Ramirez's transport. Some time later, Villarreal returned the service truck, told Soto that he had fixed a flat tire on Ramirez's transport, and got into the passenger side of the van, which left the facility.[1] Ramirez finished loading his transport and left it to run errands before embarking on his route.

The next person to arrive at the Kazien facility was John Bannerman. He noticed that the service truck had been used and asked the security guards if anyone had been in the truck that day. Upon learning of Villarreal's morning visit, Bannerman decided to inspect Ramirez's transport and asked Soto to accompany him. Bannerman climbed onto the transport and opened the door of one of the trucks mounted on the top tier. Inside he discovered a large black duffel bag containing bales of marijuana. Bannerman called his supervisor, Cal McGaridge. McGaridge arrived not long after accompanied by Drug Enforcement Administration Agent Robert Perez. Bannerman explained to Agent Perez what had happened, and he and

---

[1] The driver of the van remains unidentified.

Agent Perez watched Ramirez's transport and awaited Ramirez's return.

Ramirez returned to the facility at about 1:15 p.m., and after brief preparations, left in the transport. Agent Perez followed Ramirez to a nearby Border Patrol checkpoint. At the checkpoint, Border Patrol Agent Scott McCauley inspected Ramirez's transport. On inspection of all the trucks on the top tier of the transport, Agent McCauley discovered black duffel bags containing a total of 494.8 pounds, or 224.44 kilograms, of marijuana. Agent McCauley was able to inspect only the trucks on the top tier thoroughly; the support structures of the top tier blocked the doors of the trucks loaded on the bottom. Looking through the windows of the trucks on the bottom, Agent McCauley saw nothing.

Agent Perez arrested Ramirez. Though Ramirez now denies confessing, Agent Perez's version of events following the arrest is as follows. Ramirez confessed that he had been hired by an unknown person to smuggle an unknown amount of marijuana to Dallas. Ramirez said that earlier in the day two people had delivered the marijuana in a van and helped him to load the marijuana onto his auto transport.

When arrested, Ramirez was in possession of Villarreal's cellular telephone, the same phone to which he had made the call from the driver's room telephone requesting "liquid." Ramirez told Agent Perez that he had received the phone when he took delivery of the marijuana. Agent Perez took possession of the phone after

5

arresting Ramirez. While Agent Perez held the phone, there were eight incoming calls from 3:12 p.m. to 4:42 p.m., all from a Kaizen cellular phone assigned to Villarreal.[2] Agent Perez answered the calls, but the caller hung up each time.

After his arrest, Ramirez's transport was returned to Kaizen. The trucks were left on the transport, and a different driver delivered them to the dealer the next day. While unloading the vehicles, the Kaizen driver discovered another duffel bag containing marijuana in a vehicle on the bottom tier of the transport. After Ramirez's transport was returned to the Kaizen facility, Bannerman inspected it and found no evidence of a broken hydraulic line, which he would expect to find if the transport had needed hydraulic fluid. Neither did Bannerman find evidence of a flat tire, which had been Villarreal's stated purpose in being at the facility that morning.

Ramirez and Villarreal were tried jointly for conspiracy and possession of marijuana with intent to distribute. Ramirez testified in his own defense. He denied confessing and testified that he never saw a van that morning, that he called Villarreal only because his transport needed maintenance—the transport's hydraulics were malfunctioning and one of the tires, though it was not flat, needed air—and that he was unaware that marijuana had been hidden in vehicles on his transport. Ramirez admitted having

---

[2] Ex. 3.

Villarreal's cellular phone, but said that Villarreal had loaned him the phone the week before.

Ramirez was convicted only of the possession count, while Villarreal was convicted on both counts. Both defendants appeal their convictions, asserting various points of error.

**II. DISCUSSION**

A. Ramirez's claims

    1. <u>Improper prosecutorial remarks</u>

Central to Ramirez's conviction was the jury's conclusion that he knew the marijuana was hidden in the trucks on his transport. During closing arguments, counsel for Ramirez argued that the government was prosecuting Ramirez despite knowing that he was innocent:

> Why is the government trying to bring in information like that [referring to small details of events surrounding the arrest] or trying to stick that in your mind. Because they don't have anything else. Because they know Fredi [Ramirez] didn't know also, but they want to prosecute somebody. [Agent] Perez wants a conviction. Fredi did not know there was marijuana in that trailer.

The Assistant U.S. Attorney's ("AUSA") response included the following:

> Do the agents have any reason? Do they have a reason to throw away their career, to say, oh this load is just too much for me, I'm going to give up my twenty-year law enforcement career, because I really care that two people get convicted. They're there to testify to the truth. They enforce the laws and they're going to honor it. And they're going to say, these are the facts.
>         \*  \*  \*

I guess they want you to think that you we [sic] made this

whole thing up, that Agent Perez after twenty years in law enforcement, seven years as a special agent with the Border Patrol working out of DEA just— [3]

Defense counsel objected and moved for a mistrial, arguing improper vouching for government witnesses by the prosecution. The district court denied the motion and issued no curative instruction. However, its general instructions to the jury included admonitions that the jurors are the sole appraisers of witness credibility and that the lawyers' arguments are not evidence. [4]

Ramirez contends that the AUSA erred by vouching for Agent Perez's credibility. The defendant seeking to overturn his conviction for improper remarks by the prosecution has a substantial burden. United States v. Diaz-Carreon, 915 F.2d 951, 956 (5th Cir. 1990); prosecutorial remarks alone rarely are

---

[3] 2 R. at 183-84, 192.

[4] The instructions in part state:
Remember that any statements, objections, or arguments, made by the lawyers are not evidence. The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case. . . . In the final analysis, however, it is your own recollection or interpretation of the evidence that controls in this case. What the lawyers say is not binding upon you.
\* \* \*
You are the sole judges of the credibility or the "believability" of each witness and the weight to be given the witness's testimony. An important part of your job will be making judgment about the testimony of witnesses, including the defendant, who testified in this case. You should decide whether you believe what each person has to say and how important that testimony was.
2 R. at 142-43, 14.

sufficient to warrant reversal.  United States v. Iredia, 866 F.2d 114, 117 (5th Cir.), cert. denied, 492 U.S. 921, 109 S.Ct. 3250, 106 L.Ed.2d 596 (1989).  To constitute reversible error, the comments must not only be inappropriate but also must "affect substantially the defendant's right to a fair trial." United States v. Murrah, 888 F.2d 24, 27 (5th Cir. 1989).

"It is particularly improper, indeed, pernicious, for a prosecutor to seek to invoke . . . the sanction of the government itself as a basis for convicting a criminal defendant." United States v. Gallardo-Trapero, 185 F.3d 307, 320 (5th Cir. 1999) (citations omitted).  The prosecutor's vouching for government witnesses vests them with "the imprimatur of the Government, and may induce the jury to trust the Government's judgment rather than its own view of the evidence." United States v. Young, 470 U.S. 1, 18-19 (1985).  Equally harmful is the implication that the prosecutor has reached a conclusion based on facts not in evidence. Id.

While prosecutorial vouching for government witnesses is never desirable, Young recognized that to the extent the prosecutor's remarks are invited by similar remarks from the defense, we must "not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." Id. at 13.  The prosecutor's response will not necessarily warrant reversal, so long as it is designed merely to "right the scale." Id. at 12-13.

9

The trial judge, relying on <u>Gallardo-Trapero</u>, concluded that the AUSA's remarks did not warrant a mistrial. He reasoned that the AUSA's remarks were invited by defense counsel's assertion that the government knew Ramirez was innocent and counsel's implication that Agent Perez testified falsely out of desire for a conviction. The judge noted that the AUSA had not referred to facts not in evidence.[5] He also estimated that the remarks we found inappropriate in <u>Gallerdo-Trapero</u> were more provocative and stronger endorsements of the government witnesses than were this prosecutor's remarks.[6]

Defense counsel's attack on the government and Agent Perez was certainly inappropriate, but we conclude that the prosecutor exceeded the range of response necessary to "right the scale." As we have stated before, "[t]he power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says." <u>United States v. Garza</u>, 608 F.2d 659, 663 (5th Cir. 1988). The AUSA was entitled to argue in response to the defense attack that Agent Perez had no reason to lie, <u>see United</u>

---

[5] In adverting to Agent Perez's twenty-year law enforcement career, the AUSA was referring to a fact in evidence — Agent Perez had testified to his law enforcement experience.

[6] Between defense counsel's objections, the U.S. Attorney in <u>Gallardo-Trapero</u> stated:
"I repeat, do you think that agents for the federal government and a prosecutor for the federal government, for the United States of America, are going to risk their career and get on the stand and commit *** perjury and risk their career. It's not going to happen, ladies and gentlemen."
<u>Gallardo-Trapero</u>, 185 F.3d at 319 n.5

States v. Munoz, 150 F.3d 401, 414 (5th Cir. 1998), but she went too far in arguing that, as a rule, federal law enforcement agents appear in court and tell the truth.

We recognize the difficulty of fashioning a counterbalance to inappropriate remarks by defense counsel. As the Court in Young noted, id. 470 U.S. at 13, and as the trial judge acknowledged, the better alternative would be for the district judge to intervene at the point of defense counsel's remarks—or at least after their conclusion—with a warning and a curative instruction, thus obviating the need for the prosecutor to respond.

Having agreed that the AUSA's remarks were inappropriate, we turn to their effect on Ramirez's substantial rights. To gauge the effect to Ramirez's substantial rights, we must consider "(1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt." United States v. Tomblin, 46 F.3d 1369, 1389 (5th Cir. 1995).

The magnitude of prejudicial effect is measured by "looking at the prosecutor's remarks in the context of the trial in which they were made and attempting to elucidate their intended effect." United States v. Fields, 72 F.3d 1200, 1207 (5th Cir. 1996). We give substantial weight to the district court's assessment of prejudicial effect. Id. After considering the effect of the remarks, the trial judge decided that they were not so prejudicial as to warrant reversal. Viewing the remarks in context, we agree.

11

They were not "so pronounced and persistent" as to "permeate the entire atmosphere of the trial." See Iredia, 866 F.2d at 117 (citing United States v. Williams, 809 F.2d 1072, 1096 (5th Cir.), rev'd on other grounds, 828 F.2d 1, cert. denied, 484 U.S. 896, 108 S.Ct. 228, 98 L.Ed.2d 187 (1987)). The AUSA's focus was not on Ramirez's confession as recounted by Agent Perez. Rather, she provided a survey of all the evidence supporting Ramirez's guilt. In addition, the court instructed the jury that the lawyers' arguments were not evidence and that the jurors alone must evaluate witness credibility.

Further weighing against reversal of Ramirez's conviction is substantial evidence pointing to his guilt. The marijuana was found on the auto transport while it was under Ramirez's control. "Knowledge of the presence of a controlled substance may be inferred from the exercise of control over a vehicle in which the illegal substance is concealed." Diaz-Carreon, 915 F.2d at 954. In the case of contraband contained in hidden compartments, guilty knowledge could not properly be inferred from control of the vehicle alone. See, e.g., id. The jury was instructed to decide whether the drugs were in a hidden compartment, then to decide whether other evidence supported an inference of knowledge.

Whatever conclusion the jury reached on the predicate point, an inference of knowledge from mere control of the transport was unnecessary. The only way one could reach the trucks on the top tier would be to climb up the side of the transport and hold on.

12

A jury contemplating the large, unwieldy duffel bags could infer that the bags had to be placed in the trucks before the trucks were perched on the top tier of the transport. The conclusion that the bags were loaded first is especially reasonable in light of evidence that marijuana was found also in a truck on the bottom tier, which Agent McCauley testified was inaccessible while loaded on the transport.

Possibly attempting to provide for the opposite inference, i.e., that the drugs were placed into trucks already loaded on the transport, Ramirez testified that he loaded four trucks onto the top tier of the transport, then discovered that the hydraulics were malfunctioning and called Villarreal. At least with respect to the trucks on the top tier, this scenario would allow for a window during which someone could hide the bags in the trucks after Ramirez inspected and loaded them but before they were raised beyond reach. However, the contradiction between Ramirez's sequencing of events and other evidence only lends greater support to the inference of guilt. Soto testified that Ramirez called to request "liquid" just after he obtained his route assignment, not after the hour or so it would take to inspect and load four trucks onto the transport. The phone records reflect a call from the phone in the drivers' room to Villarreal's cellular phone at 8:07 a.m., just after Ramirez's arrived at 8:00. Moreover, Ramirez's explanation does not account for the marijuana in the truck on the bottom tier of the transport.

13

Other inconsistencies further support the inference of guilt. Ramirez's testimony that he received Villarreal's cellular phone days before his arrest is incompatible with evidence from phone records that the call he made from the phone in the drivers' room was placed to that cellular phone. Though Ramirez testified he called Villarreal because his transport needed maintenance, Bannerman's inspection of the transport led him to conclude that no maintenance had been done. In contrast to his usual habit of loading his transport in the loading area, near the security guards, Ramirez loaded the transport in an area away from the guards' post where his transport was obscured by trees. The jury reasonably could have inferred that these inconsistencies betray an agreement that the call for "liquid" was a disguised signal for the delivery of the marijuana, and that Villarreal's rare Sunday morning appearance in a large van with another person was not to repair the transport but to deliver the marijuana.

In sum, the record reveals abundant support for the conclusion that Ramirez knew he was carrying marijuana. We conclude, viewing the prosecutor's remarks in the context of the trial as a whole, that Ramirez's substantial rights were not affected.

2. Unconstitutionality of § 841(b)

Ramirez raises the unconstitutionality of 21 U.S.C. § 841(b), which this Court has interpreted to treat drug type and quantity not as elements of the crime but as sentencing factors, and asserts that § 841(b) violates Apprendi v. New Jersey, 530 U.S. 466 (2000).

14

Ramirez acknowledges that we rejected this argument in <u>United States v. Slaughter</u>, 238 F.3d 580, 582 (5th Cir. 2000), <u>cert. denied</u>, 532 U.S. 1045 (2001), but wishes to preserve the issue for further appeals.  We are bound by our precedent on the issue; thus, we reject Ramirez's constitutional claim.

B. Villarreal's claims

1. <u>Testimony of Agent Perez</u>

Before trial, the prosecution and counsel for Villarreal agreed to the admission of Ramirez's confession so long as any mention of Villarreal was omitted from the statement and from the testimony of Agent Perez in connection with the statement.[7]  In keeping with this agreement, Agent Perez did not mention Villarreal during his recounting of Ramirez's confession.  Despite his waiver of objection to admission of Ramirez's confession, Villarreal now

_____

[7] The following discussion of the agreement took place just before trial:
MS. SMYTH [for the United States]: One [issue], I believe we have already reached an agreement on.  It was the statement by co-defendant Ramirez.  We had talked — I told you in a pre-trial conference that I wanted to go ahead and discuss that prior to the beginning of trial, a statement that he made to Border Patrol agents.  I believe we already showed a copy to defense attorney representing Mr. Villarreal-Lara.
MR. ALMARAZ [counsel for Villarreal]: That is correct, your honor.
THE COURT: Is that agreed, then?
MR. GARCIA [counsel for Ramirez]: Yes, your honor.
MR. ALMARAZ: Yes, my client's name has been redacted.  Any mention of my co-worker and his name has been redacted.  We would just ask that the prosecutor—  to make sure that the agent that testifies about any statements not mention my client.
THE COURT: Very well.

R.2 91-92

15

objects to admission of the confession, contending first, that it violated Bruton v. United States, 391 U.S. 123 (1968), and second, that it was hearsay.

Having waived his objection to admission of the statement, Villarreal cannot now argue that its admission was error. United States v. Reveles, 190 F.3d 678, 683 (5th Cir. 1999)(quoting United States v. Olano, 507 U.S. 725, 733, 113 S.Ct. 1770 (1993)). Likewise, Villarreal's hearsay objection to Agent Perez's testimony fails. Villarreal's waiver was unqualified except for the condition that Agent Perez not mention Villarreal. Especially in view of the fact that Villarreal made no hearsay objection to the testimony at trial and requested no hearsay instruction,[8] we conclude that Villarreal waived all objections to admission of the testimony.

Villareal protests that Agent Perez breached the agreement to redact his name from the confession. We disagree. The first mention of Villarreal was during redirect examination of Agent Perez after defense counsel attempted to develop the theory that Agent Perez learned everything he knew about the case independent of the disputed confession by Ramirez. The prosecutor sought, here unsuccessfully, to rebut this theory by eliciting what Agent Perez learned not from other witnesses but directly from Ramirez:

_____

[8] Villarreal did request an instruction under Bruton, which the trial judge declined to issue, reasoning that because Villarreal's co-defendant Ramirez testified, Bruton was not implicated.

16

Q: And when you talked to the defendant [Ramirez] – prior to talking to him, you did not know that two people were involved as far as driving the van there; is that correct?

A: I did know because *Bannerman* had told me that David [Villarreal] had showed up. And that's how I knew that there was somebody else in it.[9]

Counsel for Villarreal objected that Agent Perez's answer was hearsay. The court sustained the objection and instructed the jury appropriately. Villarreal now protests that the court's remedial action was insufficient to cure the prejudice resulting from Agent Perez's inadmissible testimony.

Villarreal's contention is meritless. First, Agent Perez mentioned Villarreal not in connection with Ramirez's confession, but in connection with a statement by John Bannerman. Therefore, while the statement was inadmissible hearsay, it was not in breach of the agreement between the government and Villarreal. Second, to cure the hearsay testimony, the court instructed the jury to disregard the question and answer. When the court directs the jury to disregard evidence determined to be inadmissible, the evidence will not provide a basis for reversal unless it is "so highly prejudicial as to be incurable by the trial court's admonition." United States v. Klein, 546 F.2d 1259, 1263 (5th Cir. 1977). Only remarks likely to have a substantial impact on the jury's verdict warrant reversal. Id.

Agent Perez's mention of Bannerman's statement caused

---

[9] 2 R. at 17 (emphasis added).

Villarreal minimal prejudice, if any. Soto had already testified to Villarreal's arrival in the van. Moreover, the testimony actually advanced the defense assertion that Ramirez never confessed; Perez was admitting that he had learned of Villarreal's presence not from Ramirez but from Bannerman. No reversible error occurred in this portion of Agent Perez's testimony.

Villarreal challenges another portion of Agent Perez's testimony, in which Agent Perez, in response to questioning from Villarreal's counsel, stated that Ramirez told him he had received a cellular phone at the same time he received the marijuana. The testimony makes no mention of Villarreal.[10] Counsel for Villarreal failed to object to Agent Perez's answer.

This contention, too, is without merit. The jury could have inferred when Ramirez obtained the cellular phone from other evidence. Agent Perez did mention Ramirez's confession in

---

[10] Quoted in context, the testimony was as follows:
Q: Now, you mentioned several phone tolls that you brought and mentioned to the jury yesterday. You cannot tell the jury how many days Mr. Ramirez had had that cell phone.
A: Yes sir, I can.
Q: Okay. You have no idea what person was using that phone during those calls.
A: Yes, sir, I can.
Q: You were there when the calls were being made?
A: No, but based on what Fredi [Ramirez] told me. He told me that he had received the phone at the same time he had received the marijuana.
Q: You have no idea of the conversation that took place on all of those calls?
A: I do on one of them, yes sir.
Q: Okay.
R.2 at 4.

18

answering these questions, but he avoided mentioning Villarreal's name and the fact that the phone belonged to Villarreal. Thus, Villarreal is bound to his waiver.

    2. <u>Testimony of Agent Shawn Hacking</u>

Villarreal argues that the government's expert witness, DEA Agent Shawn Hacking, testified regarding Ramirez's mental state, which under Federal Rule of Evidence 704(b) is outside the purview of expert testimony. The prosecutor at first sought an explicit opinion, asking, "And based on your experience, do those drivers know what they are carrying?"[11] On defense counsel's objection, the prosecutor rephrased her question in terms of how drug conspiracy organizations choose their drivers. Agent Hacking, with no objection from defense counsel, testified that drivers are paid based on past performance, and that organizations tend to seek trustworthy drivers because their cargo is valuable and uninsurable.[12]

Because Villarreal failed to object to Agent Hacking's testimony, our review is confined to that for plain error. Plain

_____

[11] R.2 at 63.

[12] Agent Hacking testified:
With a legitimate product you have-- you don't have to conceal it. And you have insurance in case the product is lost or damaged. In the case of an illegal product, of course you have to conceal it and try to get it where it's going without being detected. There is no insurance if it's lost or stolen. The only real assurance you have is the trust you have in the people that are working for you.
R.2 at63-64.

error requires that there be (1) error; (2) that is plain, which "at a minimum," means "the error is clear under current law," and (3) that affects the substantial rights of the defendant. <u>Olano</u>, 507 U.S. at 733-34, 113 S.Ct. at 1777-78. Whether to correct forfeited plain error is within the discretion of the reviewing court. <u>Id.</u> at 735, 113 S. Ct. at 1778. The exercise of our discretion is appropriate only when the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" <u>Id.</u> at 736, 113 S. Ct. at 1779 (quoting <u>United States v. Atkinson</u>, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)).

This Court has held that "narcotics agent[s] may testify about the significance of certain conduct or methods of operation unique to the drug business so long as the testimony is helpful and its relevance is not substantially outweighed by the possibility of unfair prejudice or confusion." <u>United States v. Garcia</u>, 86 F.3d 394, 400 (5th Cir. 1996). The government goes too far in soliciting the functional equivalent of an opinion whether the defendant knew he was carrying drugs. <u>United States v. Gutierrez-Farias</u>, 294 F.3d 657, 663-64 (5th Cir. 2002).

The testimony we held to be improper in <u>Gutierrez-Farias</u> bears great similarity to that offered by Agent Hacking.[13] As did the

---

[13] In <u>Gutierrez-Farias</u>, Agent Afanasewicz described the manner in which people are chosen to transport drug[s]:
The way it usually works in that respect is that I don't think they would target somebody just off the street that, you know,

20

agent in Gutierrez-Farias, Agent Hacking made the generalization, albeit not quite directly, that drivers know they are carrying drugs. Thus we are presented with a violation, plain under Gutierrez-Farias, of Federal Rule of Evidence 704(b). Villarreal has the burden of demonstrating that the error affected his substantial rights, i.e., affected the outcome of the proceedings. Olano, 507 U.S. at 734. He has not met this burden.

Agent Hacking's testimony was relevant to the mental state of the driver, Ramirez; it was not relevant to Villarreal's mental state. Additionally, the court instructed the jury both before Agent Hacking testified and again at the end of the trial, explaining that (a) Agent Hacking was not claiming to know the particular facts of the case and (b) his testimony was to be weighed and could be disregarded like that of any other witness. Considering these factors together with the other evidence, discussed below, from which the jury could infer Villarreal's guilt, we conclude that admission of Agent Hacking's testimony did

---

has no knowledge. Usually, it's somebody that is a friend of a friend. It could start that way.
Usually they want to use people that are--that can be--have a certain amount of trust and responsibility because you have to realize as we showed before here, the amount of money that the narcotics communicates too. It's a lot of money and, you know, this is, like I said, a business. So I mean, just as in any other business, the people need a certain amount of credentials, if you will, to be employed or to be sought out by a narcotics trafficking organization.

Gutierrez-Farias, 294 F.3d at 662.

not affect Villarreal's substantial rights.

## 3. Sufficiency of the Evidence

Villarreal challenges the sufficiency of the evidence supporting his convictions. We view the evidence "in the light most favorable to the verdict to determine whether a rational jury could have found the elements of the offense beyond a reasonable doubt." Gutierrez-Farias, 294 F.3d at 660. We accept all credibility choices tending to support the verdict. Id.

The conviction for possession of more than 100 kilograms of marijuana with intent to distribute requires the government to establish the defendant's "1) knowing; 2) possession of a controlled substance; 3) with the intent to distribute it." Id. Possession may be constructive; "constructive possession is 'the knowing exercise of, or the knowing power or right to exercise, dominion and control over the proscribed substance.'" United States v. Brito, 136 F.3d 397, 409 (5th Cir. 1998)(citation omitted). To establish aiding and abetting under 18 U.S.C. § 2, the government must show that the defendant (1) associated with a criminal venture, (2) participated in the venture, and (3) sought by action to make the venture successful. United States v. Carreon-Palacio, 267 F.3d 381 (5th. Cir 2001).

To sustain a verdict for conspiracy, the government must establish: "1) the existence of an agreement between two or more persons; 2) the defendant's knowledge of the agreement; and 3) the defendant's voluntary participation in the conspiracy." United

22

States v. Brown, 29 F.3d 953, 958 (5th Cir.), cert. denied, 513 U.S. 1021, 115 S.Ct. 587, 130 L.Ed.2d 501 (1994). No proof of an overt act is required to establish a violation of 21 U.S.C. § 846. United States v. Shabani, 513 U.S. 10, 17, 115 S.Ct. 382, 386 (1994). Each element of a conspiracy may be inferred from circumstantial evidence. United States v. Faulkner, 17 F.3d 745, 768 (5th Cir. 1994), and "may be inferred from the development and collocation of circumstances." United States v. Mendoza, 226 F.3d 340, 343 (5th Cir. 2000). The government must, however, do more than simply "pile inference upon inference upon which to base a conspiracy charge." United States v. Williams-Hendricks, 805 F.2d 496, 502 (5th Cir.1986). The government cannot "prove up a conspiracy merely by presenting evidence placing the defendant in a climate of activity that reeks of something foul." United States v. Maltos, 985 F.2d 743, 746 (5th Cir. 1992).

Although the jury acquitted Ramirez of conspiracy, we conclude that the evidence supports beyond a reasonable doubt that Villarreal conspired with Ramirez to possess more than 100 kilograms of marijuana with the intent to distribute it. See United States v. Zuniga-Salinas, 952 F.2d 876 (5th Cir. 1992) (coconspirator's acquittal does not bar defendant's conviction for conspiracy—apparent inconsistency could indicate no more than leniency, mistake, or compromise by the jury).

Ramirez obtained his dispatch sheet, with the list of trucks to be taken, when he arrived to work that morning. The jury could

23

reasonably infer that Ramirez did not know until then which trucks he would receive, and that the marijuana was not loaded into the trucks until after he received them. Ramirez's 8:07 a.m. call, made before Ramirez would have had time to discover the malfunctioning hydraulics to which he testified, brought Villarreal, who rarely worked on weekends, to Kaizen that early Sunday morning in a large van driven by an unknown person. From these facts the jury could infer that the call was an agreed-upon signal for Villarreal to deliver the marijuana.

The van, which arrived just as Ramirez was loading his transport, did not stop to check in with the security guards; rather, it proceeded directly to the area where Ramirez was loading—out of view of the security guards. The reasonable inference is that Villarreal wanted to avoid the guards for fear that they might inspect the van and discover its cargo. The limited accessibility of the trucks while loaded on the transport, taken together with the size of the duffel bags, allows for the inference that the bags were placed inside the trucks before the trucks were loaded on the transport. Villarreal's arrival that morning coincides with the opportunity to load the bags into the trucks while they were still on the ground.

Villarreal, before leaving in the van, told Soto that he had repaired a flat tire. Ramirez testified that Villarreal had added hydraulic fluid to the transport. Both explanations for Villarreal's presence were rebutted by Bannerman's testimony that

24

inspection of the transport revealed no evidence of a flat tire or a broken hydraulic line.  It is reasonable to conclude that the men both lied about maintenance being done on the truck because Villarreal was there not to perform maintenance, but to deliver the marijuana.

Ramirez testified that he had been in possession of Villarreal's cellular phone for several days, and that he had used the phone to call Villarreal in to work that morning. This explanation is contradicted by phone records reflecting the 8:07 call from the drivers' room to Villarreal's cellular phone just before Villarreal's arrival at Kaizen.  From this the jury could infer that Villarreal was in possession of the cellular phone before his arrival at Kaizen.  Ramirez's possession of Villarreal's cellular phone at the time of his arrest supports the inference that Villarreal gave him the cellular phone when the two saw each other that morning.  The reasonable inference that Villarreal was expecting to monitor Ramirez's progress is further supported by the eight calls from Villarreal's Kaizen cellular phone to his personal cellular phone that afternoon.

Viewing this aggregation of circumstances in a light favoring the verdict, we conclude that the evidence is sufficient to support Villarreal's convictions.

CONCLUSION

We have reviewed all of the errors asserted by Ramirez and Villarreal and determine that none warrant reversal of their

convictions.  We therefore affirm the judgment of the district court.

AFFIRMED.