# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 11, 2022

Lyle W. Cayce
Clerk

No. 20-50112

United States of America,

*Plaintiff—Appellee*,

*versus*

Mary Ann Lara; Melissa Janet Lara,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 2:18-CR-859-2

Before King, Higginson, and Wilson, *Circuit Judges*.
Stephen A. Higginson, *Circuit Judge*:

Sisters Mary Ann Lara and Melissa Lara were convicted by a jury of various drug trafficking counts after attempting to drive a pickup truck containing over 38 kilograms of methamphetamine hidden in a compartment in the truck's tires from Mexico into the United States. They were sentenced to 288 months' imprisonment. They each raise numerous issues on appeal. For the following reasons, we AFFIRM.

No. 20-50112

I.

A.

On April 11, 2018, Priscilla Ramirez and her two daughters approached the Eagle Pass, Texas border checkpoint, driving a black Trailblazer. At primary inspection, Customs and Border Protection Officer Emily Vasquez questioned Ramirez about her trip to Mexico. Officer Vasquez stated that Ramirez gave no direct answers, seemed nervous, would not make eye contact, and looked back in the rearview mirror quite a few times. Ramirez denied traveling with anyone else. Ramirez told Officer Vazquez that the purpose of her trip was to visit a friend. Officer Vasquez noted that Ramirez had travelled all the way from San Antonio and had remained in Mexico for a very short amount of time. Officer Vasquez sent Ramirez to the secondary inspection area for a more intensive screening.

The next vehicle to come through Officer Vasquez's lane at the checkpoint was a silver Ford F-150 truck containing Mary Ann Lara, Melissa Lara, and a child. The Laras' itinerary was exactly the same as Ramirez's. Officer Vasquez recalled that she did not get any "straight answers" from either Mary Ann Lara or Melissa Lara. Additionally, the truck's license plate returned a "text hit," indicating that a full inspection on the vehicle was necessary. Accordingly, Officer Vasquez referred Mary Ann Lara and Melissa Lara to secondary inspection.

Ramirez, Mary Ann Lara, Melissa Lara, and the children exited the vehicles for the secondary inspection, and Customs and Border Protection Officer Leonardo Lopez escorted them inside to a waiting area. He asked if Ramirez, Mary Ann Lara, and Melissa Lara were related, and they said no. He told them that they "look like sisters," but they did not respond. Once the women and children were inside, Officer Lopez visually inspected the truck. He noted that it was "abnormally" clean inside, which is a "red flag."

No. 20-50112

After the inspection, an x-ray machine indicated anomalies inside the tires. These anomalies were compartments containing methamphetamine. Laboratory testing indicated that the methamphetamine was 97% pure and had a net weight of 38.2 kilograms. No contraband was found in Ramirez's vehicle.

While in the waiting area, Ramirez, Mary Ann Lara, and Melissa Lara were separated, and their unlocked cell phones were taken by an officer. Ramirez and the Lara sisters indicated that they were traveling separately, and they acted like they did not know each other. After a little while, however, their children started talking and sharing Cheetos. The officers again asked if Ramirez and the Lara sisters knew each other, and they said "no." Eventually, the children started playing with each other, and at that time Ramirez and the Lara sisters admitted to knowing each other. The Lara sisters and Ramirez were subsequently arrested.

Mary Ann Lara, Melissa Lara, and Ramirez were ultimately charged as co-defendants, along with another woman named Ashley Trinidad. Ramirez pleaded guilty to conspiracy to tamper with a witness (for a confrontation with Trinidad in a detention center). Trinidad pleaded guilty to conspiracy to import methamphetamine. Mary Ann Lara and Melissa Lara pleaded not guilty and proceeded to trial.

B.

At the trial, Priscilla Ramirez testified that she knew Mary Ann Lara and Melissa Lara through their older sister, Carla Lara. Mary Ann Lara contacted Ramirez on Facebook, asking for a ride to Mexico to pick up a work truck from Rogelio Flores, Carla Lara's ex-husband. Mary Ann Lara told Ramirez that she would pay Ramirez $200 to bring her to Mexico to pick up the truck.

No. 20-50112

A Facebook Messenger transcript showed that Flores contacted Mary Ann Lara on April 10, 2018, asking her if she knew anyone who could drive a truck from Nava, Mexico to San Antonio, Texas as soon as possible. He offered to pay $600 plus expenses. Mary Ann Lara asked Flores what was in the truck, and he responded, "right now nothing it's clean." He also told her that the truck was not stolen. He told her to erase all their messages more than once. Mary Ann Lara told Flores that Ramirez would pick up the truck, that she would accompany Ramirez, and that she would message him later on WhatsApp. Flores would not give Mary Ann Lara an address to pick up the truck but rather stated that once she and Ramirez had arrived in Nava, he would take them to the truck. Similarly, he did not give an address at which to drop off the truck in San Antonio. Later in that Messenger conversation, Mary Ann Lara asked Flores if they could leave the next day because Ramirez needed to fix her tire. Flores responded that it was urgent that the truck be driven to San Antonio, and he said that he would fix the tire or send them additional money to fix the tire. Mary Ann Lara asked Flores not to tell anyone that they were coming to get the truck; he responded that "nobody will know about this seriously." The next morning, Mary Ann Lara told Flores that she and Ramirez had left for Mexico. Mary Ann Lara then exchanged two Facebook audio calls with Flores. After the calls, Mary Ann Lara told Flores on Messenger that she had brought Melissa Lara and "the baby" and that she had told Melissa Lara "not to say anything."

Ramirez testified that she drove Mary Ann Lara, Melissa Lara, Carla Lara's son, and her own two daughters to Nava, Mexico on April 11, 2018. She stated that they were receiving directions from Flores and that Flores' cousin was requesting updates on their trip down to Mexico. Ramirez further testified that once they arrived in Mexico, they met Flores at a gas station and followed him to get something to eat and then to a house. After waiting at the house for over 20 minutes, an old man delivered the truck. The old man gave

4

No. 20-50112

money and the keys to the truck to Flores, who in turn gave them to Mary Ann Lara. Melissa Lara drove the truck back to Texas. Because the Lara sisters did not know their way back to the border, they followed Ramirez. Ramirez had to slow down to allow the Laras to keep up with her.

The Facebook Messenger transcript showed that Mary Ann Lara and Flores were in communication during the drive to Mexico, with Flores giving directions and asking for updates. During the drive home, Flores told Mary Ann Lara that the truck would run back and forth between Mexico and Texas. Mary Ann Lara then told Flores that the license plate was expired. Flores told Mary Ann Lara to tell the checkpoint officers that the truck belonged to an aunt or a friend and that they came to Mexico to allow Carla Lara's son to see his dad.

Ramirez testified that she began to drive faster once she neared the border, because she was "thinking of [her] kids." Ramirez said that she was nervous at the primary checkpoint because her daughter got out of her car seat. She admitted to falsely telling the border patrol officer that she was traveling alone, explaining that she did not acknowledge knowing the Lara sisters because she "thought it was best to keep quiet, it would be faster." After the border patrol agents discovered the drugs in the truck, Ramirez was taken into custody.

The last Facebook message from Mary Ann Lara to Flores indicated that the Lara sisters were in line at the checkpoint. Flores asked whether they were able to cross with the expired license plate, but Mary Ann Lara did not respond. Flores continued to message Mary Ann Lara, telling her that he was worried that she was not responding.

Bjorn Schreiner, a special agent with Homeland Security Investigations, testified that on April 11, 2018 (the day the Laras were stopped at the border), Melissa Lara agreed to call Flores while agents

5

No. 20-50112

monitored and recorded the call. Agents instructed Melissa Lara to tell Flores that the truck had broken down somewhere between Eagle Pass and LaPryor and to ask him if he would come to get it. Agents believed that the truck breaking down was a logical story because Melissa Lara had told them that the truck was "driving funny and shaking really bad." Although Melissa Lara eventually told Flores that the truck broke down, she began the call by saying, "Why didn't you tell me the truck had drugs in it?" Agent Schreiner stated that as an investigative strategy, agents would not tell the target of a call that the drugs had been found. Informing Flores that the drugs had been found would likely interfere with the agents' plan to get Flores to meet them off-site.

Customs and Border Protection Officer Hector Hernandez testified regarding Ashley Lynn Trinidad's arrest. On April 18, 2018, one week after the Lara sisters were arrested, Trinidad approached the Del Rio Port of Entry, driving a silver Expedition. Based on her itinerary and story, Officer Hernandez directed her to the secondary inspection area. At secondary inspection, they found her tires loaded with methamphetamine. Laboratory testing indicated that the methamphetamine was 95% pure and had a net weight of 38.9 kilograms. Trinidad was ultimately charged along with the Lara sisters and Ramirez.

Trinidad testified that she is a close friend of Carla Lara. She stated that Carla Lara asked her to find someone to drive a truck to Piedras Negras, Mexico and back on the same day for $300. Trinidad agreed to drive the truck herself because she needed the money. After she repeatedly asked Carla Lara about the contents of the car, Lara told her that the car contained a kilogram of cocaine. At one point following their arrests, Trinidad, Ramirez, Mary Ann Lara, and Melissa Lara were all housed at the same detention center. While there, Ramirez and the Laras confronted Trinidad after Ramirez learned that Trinidad had cooperated with law enforcement. Ramirez told

6

No. 20-50112

Trinidad that she needed to "watch [her] back." Mary Ann Lara asked Trinidad why she would cooperate with the Government and stated that it was "not right, [her] snitching." Melissa Lara similarly asked Trinidad why she was cooperating.[1]

Border Patrol Intelligence Agent Gerardo Huerta testified as an expert regarding methods of operation unique to drug trafficking organizations, based on the hundreds of load driver interviews he has conducted and hundreds of load driver reports he has reviewed. He stated that drug trafficking organizations use the same tactics and procedures. They recruit drivers who are unemployed, and they send them to Mexico to pick up vehicles to bring to the United States. Drivers are at the lowest level of the organization. The load drivers he interviewed usually knew that they were transporting narcotics, but they did not know the location, type of compartment, or the amount of narcotics they were transporting. Some drivers he interviewed, however, did not know what was in the vehicle they were transporting. Based on his interviews, Agent Huerta stated that the drivers who lied to agents usually knew that they were carrying something illegal. Typically, drivers are given a partial payment when they pick up the vehicle, to cover gas, food, and lodging. They receive final payment once the narcotics are delivered in the United States. Drivers often communicate with other players in the organization via WhatsApp and Facebook, because it is harder for law enforcement agencies to retrieve the information from these applications. Some drivers bring children to distract border patrol agents. Agent Huerta also explained that in 2018 he had identified a common characteristic among certain vehicle seizures that led to the identification of

---

[1] Ramirez pleaded guilty to witness tampering based on this incident. When Ramirez testified at the Laras' trial, however, she contradicted the factual basis of her plea, and the Government impeached her.

No. 20-50112

a drug-trafficking organization out of Nava, Mexico. The vehicles all transported 30 to 40 kilograms of methamphetamine, using a compartment that was built into the wheels. Agent Huerta further testified that the street-level value of the methamphetamine found in the truck that Melissa Lara was driving was $7.4 million.

C.

Mary Ann Lara and Melissa Lara were each charged with five counts:

1. Conspiracy to possess with intent to distribute 500g or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(a), and 846;
2. Possession with intent to distribute 500g or more of methamphetamine, *id.* § 841(a)(1), (b)(1)(a);
3. Conspiracy to import methamphetamine, *id.* §§ 952(a), 960(a)(1), (b)(1), and 963;
4. Importation of methamphetamine, *id.* §§ 952(a) and 960(a)(1), (b)(1);
5. Witness tampering, in violation of 18 U.S.C. § 1512(b)(3), (k).

At the close of the Government's case, Mary Ann Lara and Melissa Lara both moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The court denied both motions. The jury ultimately convicted Mary Ann Lara of counts one through four but acquitted her on count five and convicted Melissa Lara of counts two through four but acquitted her on counts one and five.

The Sentencing Guidelines calculation for both Laras was the same. Each received a total offense level of 42, with a guidelines range of 360 months to life imprisonment. The district court downwardly varied and sentenced each sister to 288 months' imprisonment. Both Mary Ann Lara and Melissa Lara appealed.

No. 20-50112

## II.

On appeal, Mary Ann Lara and Melissa Lara both raise the following four issues: whether the district court erred in denying their Rule 29 motions; whether the district court erred by allowing the Government to elicit improper expert testimony from a Border Patrol agent, contrary to the court's own pre-trial order; whether the Government impermissibly commented on the Laras' silence in its opening and closing arguments; and whether the Government improperly alluded to evidence not in the record during its closing argument.

## A.

The Laras contend that the district court erred in denying their Rule 29 motions. They challenge only the knowledge element of their respective convictions, arguing that the evidence presented at trial was insufficient for a rational juror to find either (1) that they had knowledge that a controlled substance was hidden in the truck or (2) that they had knowingly entered into an agreement to traffic drugs.[2]

We review challenges to the sufficiency of the evidence as follows:

> Where . . . a defendant has timely moved for a judgment of acquittal, this court reviews challenges to the sufficiency of the evidence *de novo*. Though *de novo*, this review is nevertheless highly deferential to the verdict. Because of the shortcomings inherent in examining a cold appellate record without the benefit of the dramatic insights gained from watching the trial, we review the evidence and all reasonable inferences in the

---

[2] Mary Ann Lara also raises the argument that even if there were evidence that she had knowledge that *some* sort of controlled substance was in the truck, the evidence was insufficient to prove that she had knowledge of the drug type and the drug quantity. However, she correctly concedes that this argument is foreclosed by our decision in *United States v. Betancourt*, 586 F.3d 303 (5th Cir. 2009), and asserts it to preserve the issue.

light most favorable to the prosecution and to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*United States v. Delgado*, 984 F.3d 435, 446 (5th Cir. 2021) (quoting *United States v. Nicholson*, 961 F.3d 328, 338 (5th Cir. 2020)).

To convict Mary Ann Lara and Melissa Lara of Counts 2 and 4, the Government was required to prove that each knowingly possessed and imported a controlled substance. *See United States v. Lopez-Monzon*, 850 F.3d 202, 206 (5th Cir. 2017) (explaining that possession with intent to distribute requires "knowledge" and that importation of a controlled substance requires knowledge both that "the substance was controlled" and that "the substance would enter the United States" (first quoting *United States v. Patino-Prado*, 533 F.3d 304, 309 (5th Cir. 2008); and then quoting *United States v. Moreno*, 185 F.3d 465, 471 (5th Cir. 1999))). On the conspiracy counts, the Government had to prove "(1) the existence of an agreement to import or to possess with intent to distribute; (2) knowledge of the agreement; and (3) voluntary participation in the agreement." *United States v. Rodriguez-Mireles*, 896 F.2d 890, 892 (5th Cir. 1990).

"Knowledge of the presence of a controlled substance often may be inferred from the exercise of control over a vehicle in which the illegal substance is concealed." *United States v. Diaz-Carreon*, 915 F.2d 951, 954 (5th Cir. 1990). However, when the contraband was "smuggled in hidden compartments which were not clearly visible or readily accessible to the defendant," "control of the vehicle . . . does not support an inference of guilty knowledge; it is at least a fair assumption that a third party might have concealed the controlled substances in the vehicle with the intent to use the unwitting defendant as the carrier in a smuggling enterprise." *Id.* Accordingly, in such cases, "this court 'also require[s] circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge.'"

*Lopez-Monzon*, 850 F.3d at 206 (alteration in original); *see also United States v. Rojas Alvarez*, 451 F.3d 320, 334 (5th Cir. 2006) ("[W]here . . . the contraband was secreted in a hidden compartment, this court requires additional evidence to prove the knowing element, such as a consciousness of guilt, conflicting statements, or an implausible account of events.").

The question is how offense-specific this additional circumstantial evidence must be, if at all. The Laras argue that while the evidence may support the inference that they knew that there was *something* illegal about the operation to transport the truck from Mexico into the United States, it does not support the more specific inference that they knew about the existence of a controlled substance in the truck or that the conspiracy involved the trafficking of a controlled substance. If a defendant controls a vehicle with drugs in a hidden compartment and then engages in additional suspicious behavior that demonstrates a general consciousness of guilt but not necessarily specific knowledge of the presence of a controlled substance, is that enough evidence to sustain a conviction?

Our hidden compartment cases often speak of the required consciousness of guilt in general terms and focus on suspicious behavior that is not offense-specific. These cases have emphasized lies and inconsistent statements. For example, in *Lopez-Monzon* we described inconsistent statements and "attempts to mislead" investigators as "circumstantial evidence of 'consciousness of guilt.'" 850 F.3d at 207 (quoting *Rojas Alvarez*, 451 F.3d at 334). Similarly, we explained in *Diaz-Carreon* that "[a]n implausible account of exculpatory events suggests that the defendant desires to obscure his criminal responsibility" and concluded that such an "account provides persuasive circumstantial evidence of the defendant's consciousness of guilt." 915 F.2d at 955. And in *United States v. Gutierrez-Farias*, we noted "the incompleteness of [the defendant's] answers when asked where he picked up the tractor, and where he was taking it" and held

that "[b]ased on [the defendant's] demeanor at the checkpoint and the vagueness of his answers, the jury could have inferred that he knew the marijuana was in the tires but was trying to hide that fact." 294 F.3d 657, 660 (5th Cir. 2002); *see also United States v. Casilla*, 20 F.3d 600, 603 (5th Cir. 1994) ("Evasive and erratic behavior may be evidence of guilty knowledge."); *United States v. Richardson*, 848 F.2d 509, 513 (5th Cir. 1988) ("[A] less-than-credible explanation is part of the overall circumstantial evidence from which possession and knowledge may be inferred." (cleaned up)). Thus, control over a vehicle containing hidden drugs *plus* evidence of the defendant's general consciousness of guilt is enough to prove the "knowledge" element of the possession with intent to distribute and importation of a controlled substance offenses.

In this case, the record contains ample evidence of the Laras' general consciousness of guilt. To list just some of the evidence: after Flores offered (via Facebook Messenger) to pay Mary Ann Lara $600 to drive the truck from Mexico to San Antonio but refused to tell her the addresses at which she would pick up and drop off the truck and told her to delete their messages, Mary Ann Lara told him not to "say anything to anyone" about the trip; Mary Ann Lara told Melissa Lara "not to say anything" when asking Melissa to accompany her on the trip; when the truck started "driving funny and shaking really bad" on the way back from Nava, Melissa Lara continued to drive, even though her young nephew was in the backseat without a car seat; when Mary Ann Lara asked Flores about the expired license plate, he told her to lie to checkpoint agents; at the Eagle Pass checkpoint, the Laras did not give Officer Vasquez any straight answers when asked about their itinerary; the sisters lied to officers about being related when they were initially detained; and Melissa Lara deviated from the script during her monitored call to Flores, potentially alerting him that the methamphetamine had been found. Additionally, once the jury reasonably inferred Mary Ann

Lara's knowledge of the methamphetamine in the vehicle from her Facebook messages with Flores, it could have reasonably concluded that she would not put her sister in the position of unwitting drug smuggler. *See United States v. Williams-Hendricks*, 805 F.2d 496, 501 (5th Cir. 1986) (concluding that a father-son relationship supported a similar inference). Finally, the methamphetamine found in the truck's tires had a street value of $7.4 million. Given the money at stake, the jury reasonably could have inferred that Mary Ann Lara and Melissa Lara were not unwitting accomplices. *See, e.g.*, *United States v. Del Aguila-Reyes*, 722 F.2d 155, 157 (5th Cir. 1983); *United States v. Villarreal*, 324 F.3d 319, 324 (5th Cir. 2003); *Lopez-Monzon*, 850 F.3d at 209.[3]

In light of the foregoing, a rational jury could have found that Mary Ann Lara and Melissa Lara knowingly possessed and imported a controlled substance (counts two and four). Additionally, because Mary Ann Lara agreed with Flores that she would pick up the truck in Mexico and take it to San Antonio, where she would leave it for someone else to pick up, a rational jury could have found that she agreed to import a controlled substance (count three) and to possess a controlled substance with intent to distribute (count one). *See United States v. Michelena-Orovio*, 719 F.2d 738, 753-54 (5th Cir. 1983) ("[A] defendant's distribution of the contraband need not be made to the ultimate consumer in order to convict him of conspiracy to possess with intent to distribute; it may, in appropriate circumstances, be made to a coconspirator."). And because Melissa Lara agreed both to accompany Mary Ann Lara to Mexico and to drive the truck back to San Antonio, a rational jury could have found that she agreed to import a controlled substance (count

---

[3] Of course, "[t]he high volume and value of the drugs [is] not dispositive," even though "it does present circumstantial evidence that [the defendants] knew about the methamphetamine." *Lopez-Monzon*, 850 F.3d at 209.

No. 20-50112

three). We also note that the jury gave a particularized verdict, acquitting each sister of some charged conduct. Accordingly, the district court did not err by denying Mary Ann Lara and Melissa Lara's motions for judgment of acquittal.

## B.

The Laras argue that the district court erred by allowing the Government to elicit improper expert testimony from Border Patrol Intelligence Agent Gerardo Huerta. Specifically, they contend that a portion of Agent Huerta's testimony improperly commented on the ultimate issue in the case: whether the Laras knew that there were drugs hidden in the tires of the truck.

The relevant testimony is as follows:

- [Government]: Okay. And how many load drivers have you interviewed over your career?
- [Huerta]: Hundreds.
- [Government]: And how many load driver reports have you reviewed in your career?
- [Huerta]: Hundreds.
- [Government]: Okay. Now, based on those interviews and that -- the reviews in the reports, generally how much did these load drivers know about the inner workings of the [drug trafficking organization]?
- [Huerta]: Well, usually it's -- they know they're transporting narcotics, but they don't know the location, the type of compartment, or the amount of -- of the narcotics they're transporting.
- [Government]: So, they don't -- again, they don't know what they're trans -- they -- they know that there's something in there, they don't know what they're transporting?
- [Huerta]: Yes, sir.

14

No. 20-50112

Following this testimony, on cross-examination Agent Huerta agreed that drug-trafficking organizations do not always inform their drivers that vehicles contain contraband and that he was familiar with smuggling cases where the drivers did not know what they were transporting. None of the parties referenced any of the above testimony in their closing arguments.

i.

The parties contest the standard of review for this issue. Before trial, the Government gave notice that it intended to offer the expert testimony of Agent Huerta to address, in part, the techniques that drug trafficking organizations use to distribute narcotics, including "narcotics trafficking patterns and importation practices." Citing *United States v. Gutierrez-Farias*, 294 F.3d 657 (5th Cir. 2002), both Laras filed pretrial motions in limine seeking to exclude any expert testimony that would impermissibly assert an opinion with respect to their knowledge of the presence of the drugs. During a pretrial conference, the district court granted the motions in limine with respect to that objection, assuring the Laras' attorneys that it would not allow Agent Huerta to "give an opinion as to your clients' state of mind." Significantly, however, when Agent Huerta testified, neither Lara made a contemporaneous objection to the now-challenged portion of his testimony. Because the Laras failed to contemporaneously object, the Government argues that the admission of this testimony should be reviewed for plain error. The Laras argue that the district court's ruling on their pretrial motion in limine preserved their objection, making abuse of discretion the appropriate standard.

Federal Rule of Evidence 103(b) provides that "[o]nce the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal." As we explained in *Mathis v. Exxon Corp.*, when this rule was adopted in 2000, it

15

No. 20-50112

"changed the law that had prevailed in this circuit" regarding the preservation of evidentiary errors. 302 F.3d 448, 459 n.16 (5th Cir. 2002) (citing Fed. R. Evid. 103(a)).[4] We had previously required parties to make contemporaneous objections at trial, even if they had made a pretrial objection to the admissibility of the challenged evidence. *Id.* at 459 & n.16. But given the 2000 amendment to Rule 103, we held that "[a] pre-trial objection is sufficient to preserve [an evidentiary] error for appellate review," regardless of whether the party objected at trial. *Id.* at 459. Similarly, in *United States v. Lucas*, we held that "Lucas was not required to renew his objection to the . . . evidence at trial. . . . A pretrial motion *in limine*, objecting to the evidence, is enough." 849 F.3d 638, 642 (5th Cir. 2017) (citing *Mathis*, 302 F.3d at 459).

One could read this language from *Mathis* and *Lucas* to suggest that the Laras preserved their objection to Agent Huerta's testimony by obtaining a pretrial ruling on their motion in limine, despite failing to contemporaneously object to the testimony at trial. However, neither *Mathis* nor *Lucas* stated whether the district court had granted or denied the motion in limine. *See Mathis*, 302 F.3d at 459; *Lucas*, 849 F.3d at 642-43. And, as the Advisory Committee Note accompanying the 2000 amendment to Rule 103 makes clear, this distinction is important:

> If the court changes its initial ruling, *or if the opposing party violates the terms of the initial ruling*, objection must be made when the evidence is offered to preserve the claim of error for appeal. The error, if any, in such a situation occurs only when the evidence is offered and admitted. *United States Aviation Underwriters, Inc. v. Olympia Wings, Inc.*, 896 F.2d 949, 956 (5th Cir. 1990) ("[O]bjection is required to preserve error

---

[4] The relevant provision was originally codified as part of Rule 103(a)(2); in 2011, it was recodified as Rule 103(b).

when an opponent, or the court itself, violates a motion *in limine* that was granted").

Fed. R. Evid. 103 advisory committee's note to 2000 amendment (emphasis added).

In accordance with this committee note, the Tenth Circuit has held that "where a ruling on a motion in limine is modified or violated, '[s]ince the error is not in granting or denying the motion in limine, but in admitting or excluding the evidence at trial, the motion in limine does not preserve this error.'" *United States v. Fonseca*, 744 F.3d 674, 684 (10th Cir. 2014) (quoting 21 Charles A. Wright & Kenneth W. Graham, Federal Practice & Procedure § 5037.16 (2d ed. 2005)). As that court explained, when a party's pretrial evidentiary objection is denied, it would be futile for that party to "continue making objections at trial." *Id.* at 683. Indeed, "requiring the renewal of objections after a definitive ruling may be a needless provocation to the trial judge, not to mention a distracting interruption during the trial." *Id.* (quoting *United States v. Mejia-Alarcon*, 995 F.2d 982, 986 (10th Cir. 1993)) (internal quotation marks omitted). "However, this reasoning seems inapplicable where evidence is admitted in spite of, rather than in accordance with, a district court's ruling." *Id.* After all, in such cases, a contemporaneous objection does not "re-rais[e] an objection that ha[s] already been rejected." *Id.* Rather, it "put[s] the district court on notice" that the other party is "violating the court's earlier evidentiary ruling." *Id.*; *cf. United States v. Soza*, 874 F.3d 884, 889 (5th Cir. 2017) (explaining that, in order to preserve an issue for appeal, the objecting party "must present the issue so that it places the opposing party and the [district] court on notice that a new issue is being raised" (quoting *Kelly v. Foti*, 77 F.3d 819, 823 (5th Cir. 1996)) (internal quotation marks omitted)).

The Laras do not cite, and we have not identified, any cases holding that the rule set forth in *Mathis* applies regardless of whether the relevant

motion in limine was granted or denied. As already explained, *Mathis* and *Lucas* neither grapple with the distinction between granting and denying a pretrial objection nor state how the district court ruled. And in the cases applying *Mathis* where the district court's ruling is identified, the relevant pretrial objection was denied. *See, e.g.*, *United States v. Lewis*, 796 F.3d 543, 545 & n.6 (5th Cir. 2015); *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 198 (5th Cir. 2016); *United States v. Avants*, 367 F.3d 433, 443-44 (5th Cir. 2004); *United States v. Ahedo*, 453 F. App'x 544, 547 (5th Cir. 2011) (per curiam).[5] Accordingly, *Mathis* and its progeny do not control this case. *See Thomas v. Tex. Dep't of Crim. Just.*, 297 F.3d 361, 370 n.11 (5th Cir. 2002) ("Where an opinion fails to address a question squarely, we will not treat it as binding precedent.").

Without any authority from our court that explicitly addresses this issue, we are persuaded by the reasoning of the Tenth Circuit and the Advisory Committee Note. When a district court *grants* a party's pretrial evidentiary objection, that party must contemporaneously object to any evidence it believes contravenes the district court's previous ruling. If the party does not object, the admission of that evidence is reviewed for plain error. *See Avants*, 367 F.3d at 443 ("Evidentiary rulings are reviewed for abuse of discretion; however, in the absence of a proper objection, we review only for plain error.").

ii.

Under plain error review, the appellant must show that: "(1) there was an error; (2) the error was clear or obvious; (3) the error affected his or her

---

[5] Further, though neither *Mathis* nor *Lucas* states how the district court ruled on the relevant motion in limine, the circumstances of those cases suggest that in all likelihood the motions were denied. *See Mathis*, 302 F.3d at 459; *Lucas*, 849 F.3d at 642-43.

No. 20-50112

substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings such that we should exercise our discretion to reverse." *United States v. Oti*, 872 F.3d 678, 690 (5th Cir. 2017).

a.

Federal Rule of Evidence 704(b) states: "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." FED. R. EVID. 704(b). Accordingly, in drug trafficking cases, there is a "'fine but critical line' between 'expert testimony concerning methods of operation unique to the drug business, and testimony comparing a defendant's conduct to the generic profile of a drug courier.'" *United States v. Sosa*, 897 F.3d 615, 619 (5th Cir. 2018) (quoting *United States v. Gonzalez-Rodriguez*, 621 F.3d 354, 364 (5th Cir. 2010)). "A witness crosses this line by offering a direct opinion as to the defendant's mental state or by giving the 'functional equivalent' of such a statement." *United States v. Morin*, 627 F.3d 985, 995 (5th Cir. 2010) (quoting *Gutierrez-Farias*, 294 F.3d at 663).

While Agent Huerta did not offer a direct opinion on either Lara's mental state, the Laras argue that the challenged portion of his testimony is error under our decision in *United States v. Gutierrez-Farias*. In that case, the defendant was convicted of conspiracy and possession with intent to distribute marijuana after Border Patrol agents discovered marijuana hidden in the tires of a tractor he was towing. 294 F.3d at 659. At trial, the Government presented the expert testimony of DEA Agent Robert Afanasewicz. *Id.* at 661. The defendant challenged "the portion of Agent Afanasewicz's testimony in which he described the manner in which drug trafficking organizations generally select people to transport their drugs and the extent to which those selected are aware of the drugs they are

19

transporting," arguing that "Agent Afanasewicz was really giving an opinion as to whether [the defendant] personally had knowledge of the marijuana in the tires." *Id.* at 661-62.

We agreed. "Rather than assisting the jury to understand evidence presented or complicated fact issues in the case, Agent Afanasewicz presented the jury with a simple generalization: In most drug cases, the person hired to transport the drugs knows the drugs are in the vehicle." *Id.* at 663. Accordingly, his testimony was a "forbidden opinion on the 'ultimate legal issue' in the case." *Id.* (quoting *United States v. Speer*, 30 F.3d 605, 610 (5th Cir. 1994)). Agent Afanasewicz might not have expressly said, "In my expert opinion, [the defendant] knew the marijuana was in the tires," but we concluded that "his testimony amounted to the functional equivalent of such a statement." *Id.*; *see also United States v. Ramirez–Velasquez*, 322 F.3d 868, 879 (5th Cir. 2003) (citing *Gutierrez-Farias* in determining that an expert agent improperly "made the generalization, albeit not quite directly, that drivers know they are carrying drugs").

Here, the Government acknowledges that Agent Huerta's testimony "bears a resemblance to testimony that this Court has held to be the 'functional equivalent' of an improper opinion under Rule 704(b)." However, it argues that Agent Huerta's testimony is ultimately distinguishable from Agent Afanasewicz's testimony and the similar testimony at issue in *Ramirez-Velasquez* because, "[u]nlike those cases, Agent Huerta did not express the opinion that most drivers know or that [the Laras] knew" that their vehicles contained a controlled substance. Rather, his testimony "boiled down to 'a lot of the time, the drivers know, but they don't always.'" The Government also argues that the reach of *Gutierrez-Farias* has been limited by this court's subsequent decision in *United States v. Portillo*, 969 F.3d 144 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1275 (2021). Accordingly, the Government maintains that while Agent Huerta's

No. 20-50112

testimony is "arguably close to the line," it cannot "be definitively characterized as 'clear or obvious' error."

The Government's efforts to distinguish *Gutierrez-Farias* from this case are unpersuasive. Just like the agent in *Gutierrez-Farias*, Agent Huerta "described . . . the extent to which those selected [to transport drugs] are aware of the drugs they are transporting," ultimately testifying that drug couriers "usually" know that they are transporting drugs. 294 F.3d at 661-62. Although neither Agent Huerta nor Agent Afanasewicz expressly opined on the mental state of the defendant, both gave the "functional equivalent" of such testimony. *Id.* at 663. And while Agent Huerta did acknowledge during cross-examination that not all couriers know they are transporting drugs, this statement is simply consistent with his testimony that couriers "usually" know. *Cf. id.* at 662 ("The clear suggestion of Agent Afanasewicz's testimony is that, because *most* drivers know there are drugs in their vehicles, [the defendant] must have known too." (emphasis added)).

We also reject the argument that *Portillo* limited the holding of *Gutierrez-Farias*. In *Portillo*, the defendant challenged the admissibility of expert testimony concerning the typical characteristics of the president of the Bandidos motorcycle gang. 969 F.3d at 171. Relying upon *Gutierrez-Farias*, the defendant, who was the president of the Bandidos at the time of the offense, contended that the testimony impermissibly communicated that he must have known about and participated in the offenses. *Id.* Citing another decision where expert testimony focused more on background than on the charged defendant's culpability, the *Portillo* court suggested that the perceived inference of criminal scienter was too attenuated to violate the Rule 704(b) bar. *Id.* (citing *United States v Morin*, 627 F.3d 985, 996 (5th Cir. 2010)). However, like *Gutierrez-Farias*, both *Portillo* and *Morin* acknowledge the caution necessary when expert testimony describes criminal organizations and "typical" positions in them, in order to avoid prohibited

mental-state opinion testimony. *See Portillo*, 969 F.3d at 171; *Morin*, 627 F.3d at 995-96. Further, rather than holding that it was not error to admit the challenged testimony, *Portillo* instead concludes that "[e]ven if" the district court erred, "any error was harmless." *Id.* Accordingly, to the extent that the *Portillo* court overbroadly described the ruling in *Morin*, its statements were dicta that do not call into doubt *Gutierrez-Farias*'s holding that the "functional equivalent" of a direct opinion on a defendant's mental state violates Rule 704(b). 294 F.3d at 663; *see also id.* at 663 n.5 (acknowledging but distinguishing cases finding no Rule 704(b) error).

Because Agent Huerta effectively testified that the Laras knew that drugs were hidden in the tires of the truck they were driving, the district court's admission of that testimony was error under Federal Rule of Evidence 704(b). And because this case is indistinguishable from *Gutierrez-Faria*, the error was clear and obvious. Accordingly, the first two prongs of the plain error analysis are satisfied.

b.

To prevail under plain error review, an appellant must not only show that the district court committed a clear or obvious error but also that "the error affected his or her substantial rights." *Oti*, 872 F.3d at 690. In order to show that the error affected their substantial rights, the Laras must demonstrate that there is "a reasonable probability that [their] trial would have come out differently but for the illegitimate aspects of Agent [Huerta's] testimony." *Gonzalez-Rodriguez*, 621 F.3d at 367. "This third requirement of plain-error review has prevented defendants from obtaining relief in [many] other cases involving improper drug profiling testimony." *Sosa*, 897 F.3d at 620 (collecting cases). The question of whether an error affected an appellant's substantial rights is conceptually similar to the well-known "harmless error" inquiry, "with one important difference: It is the defendant

rather than the Government who bears the burden of persuasion with respect to prejudice." *United States v. Olano*, 507 U.S. 725, 734 (1993).

Ultimately, we conclude that Agent Huerta's testimony did not affect the Laras' substantial rights. For the reasons explained in *supra* Part II.A, even without Agent Huerta's testimony, considerable evidence supported the jury's verdict. Moreover, the jury was aware that Agent Huerta had never had "any direct conversations" with the Laras, and the court instructed the jury members that they should judge Agent Huerta's testimony "like any other testimony" and that they could "accept it or reject it," giving the testimony "as much weight as you think it deserves." In similar circumstances, we have held that a defendant's substantial rights were not affected. *See Ramirez-Velasquez*, 322 F.3d at 879 (holding that a narcotics agent's improper testimony did not affect the defendant's substantial rights given both (1) the court's instructions to the jury that the agent "was not claiming to know the particular facts of the case" and that "his testimony was to be weighed and could be disregarded like that of any other witness" and (2) "the other evidence . . . from which the jury could infer [the defendant's] guilt"). The Government's decision not to reference Agent Huerta's testimony in its closing argument further suggests that this testimony was not crucial. *Cf. Sosa*, 897 F.3d at 620 (concluding that improper drug courier profile testimony was not plain error in part because the prosecutor did not "remind the jury of the agent's improper testimony during closing argument"). We caution that under circumstances such as these, involving above all a violation of a pre-trial order, the Government would not be able to show that the error was harmless had an objection been preserved. However, considering that the Laras have not cited any cases or pointed to any facts in the record to support their argument that Agent Huerta's testimony affected their substantial rights, we cannot say that they have met their plain error burden of demonstrating that "the inadmissible

profile testimony was likely the difference maker at trial." *Sosa*, 897 F.3d at 620. Accordingly, the Laras do not prevail on this issue under plain error review.

## C.

"No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Accordingly, if a defendant decides not to testify at trial, "[t]he Fifth Amendment forbids comment by the prosecution, either direct or indirect, on the accused's silence." *United States v. Murra*, 879 F.3d 669, 682 (5th Cir. 2018) (citing *Griffin v. California*, 380 U.S. 609, 615 (1965)); *see also United States v. Martinez-Larraga*, 517 F.3d 258, 266 (5th Cir. 2008) ("[T]he Fifth Amendment's self-incrimination clause . . . preclude[s] the prosecution from arguing to the jury that the accused's failure to testify at the trial [is] evidence of his guilt.").

The Laras argue that the Government improperly commented on their choice not to testify in their own defense during its opening statement and closing argument. The Laras challenge the following remarks from the Government's opening statement:

> At the end of the proceeding the judge is going to instruct you that you are to evaluate all the evidence in this case. You will evaluate with your own common sense and your own common experiences. And I want you to look at this evidence and I want you to ask: Why? Why would someone go to a -- to a town they've never been? Why would someone pick up a vehicle from a person they've never known? Why would someone get paid to do so? Why would someone continue driving when that vehicle's shaking violently, can barely get above 50, can barely steer with a -- with a three-year-old in the car?
>
> Now, I suspect the defense is going to get up here and tell you the only crime that was committed by their clients is misplaced trust in an untrustworthy individual, [Flores]. While

No. 20-50112

> I want you to -- when you hear that, I want you to just keep asking: Why? Why ignore the red flags? Even if -- even if you're ostensibly trusting this guy, why ignore the alarm bells?

They argue that this statement indirectly comments on their decision not to testify because only they could have answered the various questions that the Government asked.

> The Laras also challenge part of the Government's closing argument:

>> How can you tell what's in someone's mind?  That's what this entire case is about, right? *You have no evidence of any statements from Ms. Mary Ann Lara or Ms. Melissa Lara.* You just have their actions; what they did, what was happening, and some lies, but *no direct statements. What was in their minds?*

>> Now, ladies and gentlemen, it -- it doesn't take a rocket scientist to kind of piece together what's happening. It doesn't take a Border Patrol intel agent, it doesn't take a Customs and Border Protection officer. It just takes some common sense.

>> When you look at the facts in this case, your common sense will lead you to one conclusion. Mary Ann Lara and Melissa Lara were conspiring to bring in a controlled substance. They were importing it from Mexico into the United States and they were taking it to San Antonio so someone else could pick it up and it could be distributed.[6]

They argue that the italicized portions of the first paragraph of this statement directly commented on their decision not to testify.

When reviewing claims that a prosecutor improperly commented on a defendant's decision not to testify, we must "first decide whether the prosecutor made an impermissible remark." *Murra*, 879 F.3d at 682. If we conclude that the remark is impermissible, we must then determine

---

[6] Emphasis added.

No. 20-50112

"whether the remark casts serious doubt on the correctness of the jury's verdict." *Id.* at 684 (cleaned up). Additionally, because, here too, the Laras "failed to object at trial," they "bear[] the burden of demonstrating that the prosecutor's statements constitute plain error." *United States v. Vargas*, 580 F.3d 274, 278 (5th Cir. 2009); *see also Oti*, 872 F.3d at 690 (describing plain error review).

The Government's above-quoted remarks are impermissible under the Fifth Amendment's Self-Incrimination Clause if either "the prosecutor's manifest intent was to comment on the defendant's silence" at trial or "the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." *Murra*, 879 F.3d at 683. This test is strict. Regarding the first prong, "[i]f there is an 'equally plausible explanation for the remark,' the prosecutor's intent is not manifest." *United States v. Green*, 324 F.3d 375, 382 (5th Cir. 2003) (quoting *United States v. Grosz*, 76 F.3d 1318, 1326 (5th Cir. 1996)). Further, "[t]he defendant bears the burden of proving the prosecutor's intent." *Murra*, 879 F.3d at 683. Regarding the second prong, "the question is not whether the jury possibly or even probably would view the challenged remark in this manner, but whether the jury *necessarily* would have done so." *United States v. Grosz*, 76 F.3d 1318, 1326 (5th Cir. 1996) (citation omitted). When making these determinations, we must examine the prosecutor's remarks "in context" rather than "isolation." *United States v. Weast*, 811 F.3d 743, 753 (5th Cir. 2016).

The Government's remarks in its opening statement were not constitutionally impermissible. In context, it does not seem likely that the prosecutor was intending to comment on the Laras' decision not to testify. Rather, the Government was apparently providing a list of rhetorical questions for the jury to keep in mind when they evaluated the defendants' knowledge based on the evidence. An "attorney is entitled to urge the

26

conclusions which the attorney thinks the jury should draw from the evidence." *United States v. Allen*, 588 F.2d 1100, 1108 (5th Cir. 1979). In doing so, the Government may utilize rhetorical questions that are "inferential in substance." *United States v. Sorzano*, 602 F.2d 1201, 1202 (5th Cir. 1979). Such questions are not impermissible comments on a defendant's right to remain silent. *See id.*

The Government's remarks in its closing argument are more difficult. One could plausibly view the prosecutor's assertions that "You have no evidence of any statements from Ms. Mary Ann Lara or Ms. Melissa Lara" and that the Laras made "no direct statements" as a comment on the Laras' decision not to testify. However, reviewing for plain error only, we pretermit confirming whether the challenged remarks were *necessarily* a comment on the Laras' decisions not to testify, as opposed to part of an argument that even though the Government had not introduced any evidence showing that either Lara had ever made a single statement to law enforcement, Flores, Ramirez, or Trinidad directly indicating that she knew the truck contained methamphetamine, the jury should nonetheless infer their knowledge from circumstantial evidence. *See United States v. Pando Franco*, 503 F.3d 389, 394 (5th Cir. 2007) ("[C]ircumstantial evidence is often used to establish the knowledge element for possession or importation of drugs."); *United States v. Zanabria*, 74 F.3d 590, 593 (5th Cir. 1996) ("The [F]ifth [A]mendment protects against compelled self-incrimination but does not, as Zanabria suggests, preclude the proper evidentiary use and prosecutorial comment about every communication or lack thereof by the defendant which may give rise to an incriminating inference."). Instead, we decide only that even if the Government erroneously commented on the Laras' decision not to testify, the Laras have not met their plain error burden of showing that such an error was, in the context of a case built on circumstantial evidence rather than

direct admissions of guilt, both obvious and substantially prejudicial. *See Oti*, 872 F.3d at 690.

Of course, in addition to prohibiting comment on a defendant's decision not to testify, the Constitution also prohibits prosecutors from commenting on a defendant's silence in certain other contexts. The Laras briefly argue that even if the challenged remarks from the Government's closing argument were not an impermissible comment on their decision not to testify, they were an impermissible comment on their post-arrest silence, in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976). Indeed, "the prosecution's introduction at trial of evidence of the accused's silence after being given *Miranda* warnings following arrest violates the due process clause." *Martinez-Larraga*, 517 F.3d at 266 (citing *Doyle*, 426 U.S. 610) (emphasis omitted). However, in this case, both Laras voluntarily waived their *Miranda* rights and talked with law enforcement after their arrest. "[E]vidence of defendant's silence and refusal to answer post-arrest questions is admissible" if it is " 'part of an otherwise admissible conversation' pursuant to defendant's Miranda waiver." *United States v. Pando Franco*, 503 F.3d 389, 397 (5th Cir. 2007) (quoting *United States v. Burns*, 276 F.3d 439, 442 (8th Cir. 2002)). After all, "[a] defendant cannot have it both ways. If he talks, what he says or omits is to be judged on its merits or demerits, and not on some artificial standard that only the part that helps him can be later referred to." *Id.* (quoting *United States v. Goldman*, 563 F.2d 501, 503 (1st Cir. 1977)). Accordingly, the Government's remarks did not violate *Doyle*.

## D.

The Laras argue that during its rebuttal closing argument, the Government improperly alluded to evidence not in the record and implied that the Laras destroyed evidence. The Government responds that the

No. 20-50112

prosecutor's remarks were a fair and direct response to defense counsel's closing arguments.

"A prosecutor may not directly refer to or even allude to evidence that was not adduced at trial." *United States v. Murrah*, 888 F.2d 24, 26 (5th Cir. 1989). Likewise, prosecutors "may not suggest that evidence which was not presented at trial provides additional grounds for finding defendant guilty." *United States v. Garza*, 608 F.2d 659, 663 (5th Cir. 1979). Rather, prosecutors are "confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence." *Vargas*, 580 F.3d at 278. In doing so, a prosecutor may directly respond to theories of the evidence offered by defense counsel. *See id.* at 279. And of course, as stated above, we examine a prosecutor's allegedly improper remarks "in context" rather than "isolation." *Weast*, 811 F.3d at 753.

During closing arguments, defense counsel for Mary Ann Lara and defense counsel for Melissa Lara both argued that the Facebook Messenger transcript shows lack of knowledge of methamphetamine because the transcript shows that Flores repeatedly told Mary Ann Lara that nothing illegal was in the truck. Melissa Lara's counsel also indicated that all the conversations between Mary Ann Lara and Flores were depicted in the Facebook Messenger transcript. In its rebuttal closing argument, the Government then made the following remarks:

> I want to make another point. We don't know what was said between these individuals in person. We don't know what was said between these individuals when they call each other on the telephone. There are even a couple of audio calls on the Facebook message. We don't know what's said then. We don't know what was said in WhatsApp, but they sure went and talked there. She told him to.

> Why is that important? Because the information you have, government -- or the Defendant's Exhibit Number One,

No. 20-50112

is a very small selection of Facebook messages that were pulled in February. There's a date on there. February 2019. This happened in April of 2018. Those were the messages that still existed in Facebook on February of 2019. Those aren't the whole story. They're a good start and they still don't show that the defendant had absolutely no knowledge. It shows that the defendant didn't delete any messages when he's saying, No, no, there's nothing in the car. Don't worry about it.

But compare that to what Ashley Trinidad told you. She told you she asked Carla multiple times, [a]re there going to be drugs in the truck I'm taking? And Carla told her several times, [n]o. Before finally saying, [a]ll right, there's one kilo of coke.

Read those messages in progress -- progression just like defense asked you to. . . . You'll see that after a while, the questions about what's in the car stop. And it's after they've picked up the truck and met with him for an hour and eight minutes in person, the truck the old man drops off and doesn't talk to them about.

The Laras argue that the prosecutor's statement that the Facebook Messenger transcript admitted at trial was a "very small selection of Facebook messages that were pulled in February" implied that a larger selection of messages existed. They further argue that the prosecutor's comparison of Mary Ann Lara's conversation with Flores to Trinidad's conversations with Carla Lara implied that these messages were incriminating. Finally, the Laras contend that the prosecutor's remark, "It shows that the defendant didn't delete any messages when [Flores is] saying, [n]o, no, there's nothing in the car," clearly implies that Mary Ann Lara or Melissa Lara deleted incriminating evidence.

However, we read the above remarks as simply emphasizing that the Facebook Messenger transcript does not definitively show lack of knowledge and does not contain all the conversations that occurred between Mary Ann

No. 20-50112

Lara and Flores. The Government was arguing that because there is no evidence of (1) what was said between Mary Ann Lara, Melissa Lara, and Flores in person or on the phone, (2) what was said during the audio calls between Mary Ann Lara and Flores referenced in the Facebook Messenger transcript, or (3) what was said on WhatsApp between Mary Ann Lara and Flores, the jury could reasonably infer that the Facebook Messenger transcript was not a complete record of the sisters' conversations with Flores. To further support the inference that Flores may have revealed the truck's contents to the Laras in one of these conversations not in the record despite not having done so in the Facebook Messenger conversation, the Government reminded the jury that (4) Carla Lara had not revealed to Trinidad that the truck she would be driving would contain drugs until after Trinidad had asked several times and (5) the Laras stopped asking Flores about the contents of the truck after they met with him in person.

Prosecutors can discuss such reasonable inferences during closing arguments. *See Vargas*, 580 F.3d at 278. Even if the prosecutor did mean to imply that Mary Ann Lara may have deleted some of the more incriminating messages, this argument would be an appropriate response to defense counsel's statement that the Facebook Messenger transcript was a complete record of any conversations with Flores. *See id.* at 279. Accordingly, the Government's remarks in its rebuttal closing argument were not improper.[7]

---

[7] The Laras also argue that the Government's rebuttal closing argument indirectly commented on their Fifth Amendment right to remain silent because only they could have answered the rhetorical questions that the Government asked in the first paragraph of the above-quoted remarks. However, as explained in *supra* Part II.C, the Government may ask rhetorical questions that are "inferential in substance" when urging "the conclusions it thinks the jury should draw from the evidence." *Sorzano*, 602 F.2d at 1202.

III.

In addition to the above issues raised by both Mary Ann Lara and Melissa Lara, Melissa Lara independently raises the following three issues.

A.

The Government called Agent Katherine Leonard to testify regarding alleged inconsistencies between what Priscilla Ramirez had told agents and what she had said on the witness stand. In her testimony at trial, Ramirez (1) denied knowing whether the Lara sisters had issues with the truck; (2) denied having concerns about what was in the truck during the trip to Mexico because she had asked Mary Ann Lara, prior to the trip, whether the truck was stolen or a drug truck; and (3) denied being nervous at the border checkpoint for any reason other than her daughter getting out of her car seat. However, Agent Leonard testified that Ramirez had previously told her during a debriefing that (1) the Lara sisters had told her that something was wrong with the truck; (2) she had tried to put distance between her vehicle and the truck because she had a "bad feeling" and was worried that something was wrong with the truck; and (3) she had felt nervous when she saw that Melissa Lara had pulled the truck directly behind her vehicle at the border checkpoint. Agent Leonard also testified that Ramirez had told her (4) that the Laras were following her because they did not know the way back to San Antonio and (5) that she had encouraged the Laras to drive faster. Melissa Lara argues that these portions of Agent Leonard's testimony are inadmissible hearsay evidence.

Statements that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement" are hearsay. Fed. R. Evid. 801(c). Hearsay is generally inadmissible. See Fed. R. Evid. 802. Because Melissa Lara did not object to Agent Leonard's testimony at trial, we yet

again review the district court's admission of the testimony only for plain error. *See Oti*, 872 F.3d at 690. As stated above, to prevail under plain error review, the appellant must show that: "(1) there was an error; (2) the error was clear or obvious; (3) the error affected his or her substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings such that we should exercise our discretion to reverse." *Id.*

The Government conceded at oral argument that the district court clearly erred by admitting the relevant portion of Agent Leonard's testimony without instructing the jury that it could not consider the evidence substantively. We agree. Agent Leonard's testimony contained out-of-court statements made by Ramirez. Though "[e]vidence of a witness' prior inconsistent statements may be admitted to impeach that witness," *United States v. St. Junius*, 739 F.3d 193, 202 (5th Cir. 2013), the court did not instruct the jury that it could only consider Ramirez's out-of-court statements for impeachment purposes. Without such an instruction, the admission of Agent Leonard's testimony was a clear and obvious error. Accordingly, we proceed to the third prong of plain error review.

"A defendant demonstrates that an error had an effect on [her] substantial rights when [s]he shows a reasonable probability that the jury, absent the error, would have acquitted [her]." *Oti*, 872 F.3d at 693. As explained above, Agent Leonard's testimony contained five relevant hearsay statements. Regarding the first statement, Agent Schreiner also testified that Melissa Lara told him the truck was driving funny and shaking. Regarding the remaining four statements, the reasons why Ramirez tried to put distance between her vehicle and the truck, why she felt nervous at the border checkpoint, and why the Laras were following her are minimally relevant to Melissa Lara's knowledge of methamphetamine in the truck, as is the question of whether Ramirez encouraged the Laras to drive faster. For these

reasons, Melissa Lara has not shown that the jury would have acquitted her but for the admission of Agent Leonard's hearsay testimony. Accordingly, she cannot prevail on this issue under plain error review.

## B.

Melissa Lara argues that the cumulative effect of the claimed trial errors described above resulted in the denial of her right to a fair trial. "The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Delgado*, 672 F.3d 320, 343-44 (5th Cir. 2012) (en banc) (cleaned up). We apply this doctrine "only in rare instances," in cases where "errors 'so fatally infect[ed] the trial that they violated the trial's fundamental fairness.'" *Id.* at 344 (citation omitted). In other words, the cumulative error doctrine "justifies reversal only in the unusual case in which synergistic or repetitive error violates the defendant's constitutional right to a fair trial." *Id.*

This case does not present such a rare situation. Melissa Lara has demonstrated that errors occurred at trial—notably, the admission of Agent Huerta's testimony that load drivers generally know that they're transporting narcotics and the admission of Agent Leonard's testimony regarding Ramirez's out-of-court statements. However, as explained above, Agent Huerta's testimony does not justify reversal under plain error review, and Agent Leonard's testimony was either cumulative or minimally relevant to the question of whether Melissa Lara knew that the truck contained drugs. Because the errors were unrelated to each other, and because one of the errors is extremely unlikely to have influenced the jury's verdict, we cannot say that this is the rare case in which individual errors do not justify reversal

but the synergistic combination of multiple errors violated the defendant's right to a fair trial.

## C.

Section 3B1.4 of the Sentencing Guidelines states, "If the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense, increase by 2 levels." Melissa Lara argues that the district court erred by applying this enhancement to her sentence.

Whether a defendant "used or attempted to use a minor to assist in avoiding detection within the meaning of § 3B1.4 is a conclusion of law that we review de novo, while any findings of fact made in support of that determination we review for clear error." *United States v. Mata*, 624 F.3d 170, 175 (5th Cir. 2010). A sentencing court's finding of fact is clearly erroneous if, after reviewing all the evidence, the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *Id.* at 173 (citation omitted). "A factual finding is not clearly erroneous so long as it is 'plausible in light of the record as a whole.'" *Id.* (citation omitted).

"Absent other evidence, the mere presence of a minor at the scene of a crime is insufficient to support the application of § 3B1.4." *Mata*, 624 F.3d at 176 (5th Cir. 2010) (cleaned up). Rather, "the defendant must take some affirmative action to involve the minor in the offense." *Id.* However, "[w]hen a defendant's crime is previously planned—when, for example, she leaves the house knowing she is on her way to smuggle drugs . . . —the act of bringing the child along instead of leaving the child behind is an affirmative act that involves the minor in the offense," at least in cases "where additional circumstantial evidence tends to confirm that the defendant brought the minor along as a decoy and to avoid detection." *Id.* at 176-77. Accordingly, "a defendant who makes a decision to bring a minor along during the

commission of a previously planned crime as a diversionary tactic or in an effort to reduce suspicion is subject to having her sentence enhanced under § 3B1.4." *Id.* at 175.

When Melissa Lara was apprehended at the border driving a truck containing methamphetamine, a child was in the car. At sentencing, the district court rejected Melissa Lara's argument that she had brought the child with her to Mexico so that the child could visit his father, finding instead that Melissa Lara had used the child as "a cover story." A variety of evidence supported this finding: the child had been sitting in the backseat, unrestrained by a car seat or seat belt; Flores had told Mary Ann Lara to tell border agents that she and Melissa Lara had come to Mexico so that the child could see his dad; the government had stated at sentencing that Melissa Lara and Mary Ann Lara told border agents that they had taken the child to Mexico to see his father, and neither Lara objected to this statement; and Agent Huerta had testified that drug traffickers commonly "bring kids to distract the [Customs and Border Protection] officer." Because the district court's finding is plausible based on this record, its finding is not clearly erroneous. Additionally, because Mary Ann Lara and Flores planned the truck's crossing the previous day, the district court could have reasonably inferred that Melissa Lara's crime was previously planned. *See United States v. Caldwell*, 448 F.3d 287, 292 (5th Cir. 2006) (explaining that a "sentencing court is permitted to make common-sense inferences from the circumstantial evidence").

By thus using a child as a diversionary tactic during the commission of a previously planned crime, Melissa Lara committed an affirmative act that involved the child in drug trafficking. Accordingly, the district court did not err by applying the § 3B1.4 enhancement to Melissa Lara's sentence. *See Mata*, 624 F.3d at 175.

## IV.

Mary Ann Lara was sentenced to 288 months in prison, a downward variance from her guidelines range of 360 months to life imprisonment. She argues that her prison sentence was substantively unreasonable. Specifically, she contends that because the methamphetamine Guideline has evolved through congressional mandates rather than through the Sentencing Commission's examination of empirical data, national expertise, and expert opinion, the Guideline lacks an empirical basis, results in guidelines ranges that are greater than necessary to determine the appropriate sentence, and produces overly severe sentences.

"We presume sentences within or below the calculated guidelines range are reasonable." *United States v. Simpson*, 796 F.3d 548, 557 (5th Cir. 2015). Mary Ann Lara relies on *Kimbrough v. United States*, in which the Supreme Court held that a district court did not abuse its discretion by concluding that the disparity between guidelines ranges for crack and powder cocaine offenses resulted in an excessive sentence, given that the crack cocaine Guideline did not reflect the Sentencing Commission's ordinary methods of relying on empirical evidence and national experience. 552 U.S. 85, 109-10 (2007). However, we have held that *Kimbrough* does not disturb the reasonableness presumption, even if the relevant Guideline is not empirically based. For example, in *United States v. Mondragon-Santiago*, we rejected the argument that the unlawful entry Guideline "is not empirically-based, and therefore should not be afforded the appellate presumption of reasonableness," explaining that while *Kimbrough* allows "district courts, in their discretion, to consider the policy decisions behind the Guidelines, including the presence or absence of empirical data, as part of their § 3553(a) analyses," the decision "does not require discarding the presumption [of reasonableness] for sentences based on non-empirically-grounded Guidelines." 564 F.3d 357, 366 (5th Cir. 2009). Similarly, in *United States v.*

*Duarte*, another case involving the unlawful entry Guideline, we held that "*Kimbrough* does not force district or appellate courts into a piece-by-piece analysis of the empirical grounding behind each part of the sentencing guidelines." 569 F.3d 528, 530 (5th Cir. 2009). Rather, "the thrust of recent Supreme Court decisions has been to affirm the traditional entrustment of sentencing to the discretion of district courts, close to the ground and more cognizant of the details of offender and offense that should be determinative of sentence." *Id.* at 530-31.

Both *Mondragon-Santiago* and *Duarte* involved the unlawful entry Guideline. However, no part of the reasoning of *Mondragon-Santiago* and *Duarte* was specific to that Guideline. Indeed, as Mary Ann Lara acknowledges, we have concluded in unpublished opinions that these decisions also control challenges to the substantive reasonableness of the methamphetamine Guideline. *See, e.g.*, *United States v. Labrador*, 734 F. App'x 270, 271 (5th Cir. 2018) (unpublished) (concluding that *Mondragon-Santiago* "foreclose[s]" the argument that a "within-guidelines sentence is substantively unreasonable because the methamphetamine Guideline is not based on empirical evidence" (citing 564 F.3d at 366-67)); *United States v. Croxton*, 693 F. App'x 327, 328 (5th Cir. 2017) (unpublished) ("Croxton's contention that the district court should have taken into account the empirical basis for the methamphetamine Guideline is foreclosed." (citing *Duarte*, 569 F.3d at 530-31)). Accordingly, we hold that *Mondragon-Santiago* and *Duarte* foreclose Mary Ann Lara's argument that because the methamphetamine Guideline is not empirically-based, her below-guidelines sentence was substantively unreasonable.

## V.

For the foregoing reasons, we AFFIRM the judgment of the district court.